## CIRCUIT COURT OF STAFFORD COUNTY

E.C.

v.

Virginia Department
of Juvenile Justice

February 10, 2014

Case No. CL09-982-00

BY JUDGE JANE MARUM ROUSH

This matter came on for a hearing on July 16 and 17, 2013, on the Petition for Writ of Habeas Corpus. At the conclusion of the hearing, the parties asked for and were granted leave to file post-hearing briefs. Since receiving those briefs on October 7, 2013, the court has had this case under advisement. The court will enter an order granting the petition. The petitioner will be awarded a new trial, if the Commonwealth be so advised.

### Factual Background and Procedural History

The petitioner in this case is E.C., who was born on June 23, 1991. On June 4, 2007, when E.C. was fifteen years old, he had a sexual encounter with E.G., a fourteen-year-old girl.

E.G.'s mother returned home from work on June 4, 2007, at about 6:30 p.m. to find E.C. leaving through her kitchen door. E.G.'s mother went upstairs to her daughter's room, where E.G. was pulling up her pants. E.G.'s mother did not talk to E.G. about what happened before calling 911. E.G.'s mother reported that there was a boy in her house and her daughter was unable to consent to sex.

E.G.'s mother testified that E.G. has various physical disabilities and emotional disorders due to a stroke E.G. suffered while in utero. E.G. is borderline mentally retarded and has attention deficit hyperactivity disorder. E.G. has cerebral palsy. Her left hand and her lower foot are spastic.

The petitioner E.C. also has cognitive deficits. Dr. Jeffrey Aaron, a licensed clinical and forensic psychologist, testified that E.C. is in the

borderline range of functioning, although he is not mentally retarded. Dr. Aaron tested E.C. and found him to have a full scale IQ of 78. Dr. Aaron found E.C. to have limited cognitive understanding, with a limited ability to think through nuanced situations. E.C. was referred for special education when he was in the third grade, although he was not in special education classes in June 2007. Some of E.C.'s classes in 2007 were smaller classes in which he was getting "extra help." Dr. Aaron noted that Dr. Stewart, E.C.'s psychologist when E.C. was committed to the Department of Juvenile Justice ("DJJ"), found E.C. to be "below average" for children in DJJ, where most children are low-functioning.

Responding to E.G.'s mother's call to 911, sheriff's deputies came to E.G.'s house to investigate the complaint. E.G.'s mother was advised to take E.G. the hospital for a "rape test." On the way to the hospital, E.G. told her mother that E.C. broke into the house and raped her.

E.C. was located in a nearby park. He was interviewed by Detective Gerald Lloyd, who, unbeknownst to E.C., recorded the interview. The interview was conducted about one hour after the sexual encounter between E.C. and E.G.

In the interview, E.C. told Detective Lloyd that he had been in E.G.'s house that afternoon, that he and E.G. had walked into the house together, that she let him into the back of the house, that she was "hot and coming on to me," that E.G. was hugging him, and that he might have "touched her butt" when she was hugging him. Detective Lloyd said "let's talk about the mistake you made." E.C. agreed that he had made a mistake. E.C. said that during the encounter both he and E.G. had their pants down, that E.G. had taken her pants off, that he did not force her to take her pants off, and that at different times each of them was on top of the other. E.C. said that he put his penis inside of E.G. but that he took it out because he decided "this is wrong." He said he thought it was wrong because "[s]he's like, special, something like that." He explained that what he meant by "special" was that E.G. was physically different. He told the detective that he did not ejaculate. He said the E.G. put her mouth on his penis but he took it out because he wanted to leave. He said that E.G. said that it hurt when E.C. had his penis inside her. E.C. agreed with Detective Lloyd's suggestion that E.C. took his penis out of E.G. because "she's kind of handicapped." Detective Lloyd asked E.C. if he thought E.G. acted more like a ten year old or a twelve year old. E.C. said she acted more like a twelve year old. Petitioner's Ex. # 5.

E.C. did not tell Detective Lloyd that he entered E.G.'s house without her permission, that he forced himself on her, that he pushed her down on her bed, or that she had said "no." Petitioner's Ex. # 5.

During the interview, Detective Lloyd asked E.C. if he was in any special education classes at school. Detective Lloyd reported to E.G.'s mother that E.C. "wasn't all that smart."

After the interview concluded, Detective Lloyd allowed E.C. to go home with his parents. Detective Lloyd testified "I did not think I had probable cause [to charge E.C.] at that point."

Two days later, on June 6, 2007, Detective Lloyd interviewed E.G. at her school. Also participating in the interview was Karen Delano, a Child Protective Services ("CPS") worker. An audio recording of the interview was made. E.G. told the interviewers that she got home about 3:30 p.m. that day, that she was home by herself, and that she was playing video games. She said that E.C. "just walked right in" to her house at 6:04 p.m. She said that E.C. locked all the doors and went upstairs to her bedroom. He told her to take off her pants or else he would take them off for her. He then "put his dick inside my birdie . . . [a]nd then he started humping me." She said that she said "stop" but "he wouldn't stop. He just kept going on." She said E.C. kissed her on her cheeks and on her stomach. He told her that he loved her. She told him to get off of her. E.G. said E.C. also put his penis "[i]n my butt." She added that E.C. began the attack by making her "suck his dick." She said he left when they heard her mother returning home. She said that E.C. should be arrested. E.G. said that she had performed oral sex on E.C. once before, about a month earlier, in the woods near their houses. She then added that she had performed oral sex on E.C. on a total of three different occasions. During the interview, Ms. Delano asked E.G. several times if she was telling the truth. Petitioner's Ex. # 6.

On June 7, 2007, E.C. was charged in the juvenile and domestic relations district court with the offenses of rape (by means of force, threat, or intimidation), abduction, and breaking and entering with the intent to commit rape. Petitioner's Ex. # 3.

On June 18, 2007, the Commonwealth's Attorney notified E.C. that he intended to move to transfer E.C.'s case to the circuit court, where E.C. would be tried as an adult.

Attorney Denise Rafferty was appointed to represent E.C. on June 28, 2007, although she did not learn of the appointment until July 9, 2007. (E.C. had prior counsel, who was allowed to withdraw.) Also on June 28, a detention hearing was held in the juvenile court. E.C. was released to the custody of his father and ordered into the electronic incarceration program ("EIP").

On July 9, 2007, Ms. Rafferty sent a letter to E.C. advising him of her appointment and telling him of the upcoming court dates of July 19 and August 22, 2007. She asked E.C. to contact her to discuss his case.

Ms. Rafferty testified that E.C. and his parents failed to keep an appointment they had made to meet with her on July 17, 2007. A telephone consultation was conducted instead of a face-to-face meeting. Ms. Rafferty's notes from that telephone consultation indicate, among other things, that she was told that E.G. invited E.C. into her house on the day in question and that E.C.'s younger brother was with E.C. that day and could be a witness on his behalf.

On July 19, 2007, a hearing was held in the juvenile court to review whether E.C. would remain in the EIP. E.C. was removed from the program and remanded to juvenile detention because his family had lost its housing and did not have a telephone land line, both of which were required for the EIP.

Ms. Rafferty contends that she had extensive conversations with E.C. alone and with E.C. and his father together, at the courthouse on July 19, 2007, the day of the EIP review hearing. Ms. Rafferty maintains that E.C. made a full confession to her. She stated that:

> [E.C.] admitted to me that he had done what he was charged with . . . . [E.C.] told me that [E.G.] did not know he planned to come into her home . . . . [E.C.] told me that he went in the back door of [E.G.'s] house without her knowledge and went up to her bedroom and that he pushed [E.G.] down on her bed and had her perform oral sex upon him followed by him having vaginal and then anal sex with her, and then again, finished with a second round of oral sex. He told me that she told him not to, and, especially, that she protested against the anal sex. He told me that he did not want his parents to know what he had done. He also told me that he knew he should not have done it. He asked me not to tell his parents.

Respondent's Ex. # 2, p. 3. Ms. Rafferty testified that she took no notes of her interview with E.C. on July 19, 2007.

E.C. denies that any extensive interview took place between him and Ms. Rafferty on July 19, 2007. He testified that he spoke with her for two minutes. She did not ask him what happened on June 4. She only asked about his EIP monitor. E.C. denies that he ever told Ms. Rafferty that he raped E.G.

E.C. testified that, sometime after July 19, 2007, he had a "video chat" with Ms. Rafferty while he was in juvenile detention. She asked him to tell her what happened. E.C. said he told Ms. Rafferty what he told Detective Lloyd. He denies telling Ms. Rafferty that he pushed E.G. on the bed, that they had engaged in anal sex, that she had told him to stop, that he raped her, that he thought E.G. was mentally retarded or slow, or that he had entered E.G.'s house without her permission.

Ms. Rafferty testified that Detective Lloyd told her that E.C. admitted to entering E.G.'s house without permission, pushing her down on the bed, and having sex with her although she said "no." Ms. Rafferty spoke to Detective Lloyd while they were both at the courthouse for other cases. She asked him if there was a tape recording of the interview, but he did not answer before he was called into the courtroom. Ms. Rafferty never followed up with Detective Lloyd to see if there was a recording of the

interview. Ms. Rafferty testified that she never asked either Detective Lloyd or the prosecutor for a copy of the recorded interview, because she did not know that there was a recording. Therefore, prior to advising E.C. to plead guilty, Ms. Rafferty had never listened to the tape recording of E.C.'s interview with Detective Lloyd.

Ms. Rafferty testified that Detective Lloyd's account of what E.C. told him "dovetailed almost exactly" with E.C.'s confession to her. Ms. Rafferty testified she was having trouble distinguishing in her mind what Detective Lloyd told her from what E.C. told her "because they were the same." The only difference was that Detective Lloyd said E.C. came through the front door and E.C. told her he came through the back door.

Detective Lloyd testified that he discussed with Ms. Rafferty his interview of E.C. The detective told her that E.C. admitted to having sex with E.G. Detective Lloyd denied that he told Ms. Rafferty that E.C. pushed E.G. onto the bed or that he broke into the house or that he forced himself on E.G.

Ms. Rafferty testified that she did not know that Detective Lloyd had talked to E.G. She thought another officer had interviewed E.G. She did not remember if she asked anyone whether the interview with E.G. was recorded. She did not know there was a recording of the interview. Therefore, before advising E.C. to plead guilty, Ms. Rafferty never listened to the tape recording of Detective Lloyd's interview with E.G. Petitioner's Ex. # 6.

Although the petition alleged that E.C. raped E.G. by use of "force, threat, or intimidation," Ms. Rafferty testified that she knew it was always the Commonwealth's theory of the case that E.C. raped E.G. by taking advantage of her mental incapacity. (Ms. Rafferty thought the discrepancy between the petition and the Commonwealth's theory of the case was of no moment, as the petition could have been amended at any time.)

Ms. Rafferty did not interview E.G. or her mother before advising E.C. to plead guilty. She testified that she asked to interview them, but E.G.'s mother "was of a different mind then." E.G.'s mother denies that she was ever asked to speak to Ms. Rafferty or that she ever refused to speak to Ms. Rafferty. E.G.'s mother said, had she been asked, she probably would have agreed to talk with Ms. Rafferty.

Ms. Rafferty did not attempt to obtain any school or treatment records for E.G. or interview any of her teachers, counselors, or therapists.

Ms. Rafferty testified that E.G. was known to be mentally retarded. She testified that Karen Delano, the CPS worker, told her that E.G. had the IQ of a seven- or eight-year old. Ms. Rafferty never knew E.G.'s specific IQ. Ms. Rafferty also observed E.G. physically and mentally. E.C.'s parents told her that E.G. was slow or mentally retarded.

Ms. Rafferty testified that she knew that the Sexual Assault Nurse Examiner ("SANE") noted trauma to E.G.'s vaginal area.

E.G.'s teachers and counselors testified that, had they been asked, they would have told Ms. Rafferty that E.G. had a reputation for dishonesty. E.G.'s school counselor testified that E.G. was known by all to be untruthful. "She had a reputation for not telling the truth and making false allegations."

In addition, the teachers and counselors, if asked, would have told Ms. Rafferty that E.G. was knowledgeable about sex and sexual terminology. One of E.G.'s teachers testified that E.G. was knowledgeable about sex when she was nine or ten years old, some four years before her encounter with E.C.

E.G.'s special education teacher testified that E.G. was in her class for children with mild intellectual disabilities and that her abilities were on the higher end for the students in her class.

E.G.'s mother testified that, had she been asked by Ms. Rafferty or the prosecutors, she would have told them that, in June 2007, E.G. had an understanding about sex. She understood that sex could be pleasurable, that it could lead to pregnancy, and that it could cause diseases. E.G. knew that her mother disapproved of her having sex.

E.C.'s father told Ms. Rafferty that E.C.'s brother could be a witness for E.C., as the brother was with E.C. when E.C. first encountered E.G. on the day in question. Ms. Rafferty was told that the brother could verify that E.G. invited E.C. into her house. Ms. Rafferty did not interview the brother before advising E.C. to plead guilty. She dissuaded E.C.'s parents from offering the brother as a witness, telling them that the brother could be prosecuted and asking them "Do you want to lose another son?"

E.C.'s brother testified he was never interviewed by Ms. Rafferty about what he saw on June 4, 2007. Had he been asked, he would have testified truthfully that he was with E.C. on the day in question. E.G. invited the brothers to come to her house for a drink and a snack. The brother did not want to come, but E.C. went. The brother saw E.G. let E.C. into her house through the back door.

Ms. Rafferty did not obtain any of E.C.'s school records before advising him to plead guilty. She said that E.C.'s parents gave her no records, and she did not try to get them directly from E.C.'s schools. She said that E.C.'s parents were resistant to any suggestion that E.C. was mentally impaired. She never felt that a mental health evaluation was necessary for E.C. His parents said that he was a C or better student and that he was not taking special education classes.

E.C.'s mother testified that she told Ms. Rafferty that E.C. was in smaller classes and getting extra help in school because he was "borderline." The mother told Ms. Rafferty that E.C. had trouble learning and understanding and that E.C. previously had an Individualized Education Program. E.C.'s mother testified that Ms. Rafferty told her that E.C.'s school records would not matter; only E.G.'s records would matter.

E.C.'s father testified that he gave Ms. Rafferty a copy of E.C.'s school records on August 22, 2007, the day of the transfer hearing and E.C's guilty plea, but that Ms. Rafferty did not use them.

Ms. Rafferty said that E.C.'s parents never gave her a witness list other than E.C.'s brother. She testified "[t]hey always said that they would get back to me, but they never did until the recantation story came up." She also complained that E.C.'s parents did not provide her with any mitigating evidence.

Ms. Rafferty testified that she prepared for the August 22, 2007, transfer hearing in juvenile court as she would prepare for a preliminary hearing. She could not recall if she prepared for the cross-examination of any of the Commonwealth's witnesses. She had a standard practice for cross-examination that she was going to follow. She did not plan to put on any evidence. She did not ask for any discovery. She felt she had a good relationship with the Commonwealth's Attorney and could have gotten anything she wanted from him. Similarly, she had worked with Detective Lloyd in the past and relied on what he told her. She testified that Detective Lloyd "was never less than honest with me about what his evidence was." Her "intent was to conduct discovery at the transfer hearing."

Ms. Rafferty testified that, prior to the transfer hearing, she spoke to the prosecutors, Detective Lloyd, the SANE, and Ms. Delano (the CPS worker). She had also spoken with E.C.'s parents and E.C., who, she maintains, made a full confession to her.

On August 22, 2007, the transfer hearing was held in juvenile court. Ms. Rafferty could see that the Commonwealth's witnesses would be Detective Lloyd, Deputy Chinault (another investigator), the SANE, and E.G.'s mother. Ms. Rafferty believed that the Commonwealth had more than enough evidence to establish probable cause. She testified: "All they needed was a snowflake or a snowball and they had an avalanche. That is a helpful way of describing it for the family."

The Commonwealth offered a plea deal to E.C.: E.C.'s case would stay in juvenile court and not be transferred to circuit court, the abduction charge would be dropped, and E.C. would agree that there were "facts sufficient" to find him guilty of rape and burglary. There was no agreement on what disposition E.C. would receive, or whether E.C. could appeal for a trial *de novo* in circuit court. The offer was silent on the issue of whether E.C. would have to register as a sex offender.

Ms. Rafferty first relayed the plea offer to E.C.'s parents on the day of the transfer hearing. Ms. Rafferty told E.C.'s parents that the Commonwealth had DNA evidence against E.C., that Detective Lloyd was going to testify that E.C. had confessed, and that E.C. had in fact confessed to the rape and the burglary. Ms. Rafferty told the parents that if E.C. went to trial, he would be convicted, and he would be sentenced to twenty-five years in an adult facility. E.C.'s parents were told nothing about the possibility that

E.C. would be required to register as a sex offender. Both parents felt E.C. should accept the offer because they did not want him to go to an adult jail or the penitentiary. E.C.'s father thought that E.C. had no choice but to plead guilty because Ms. Rafferty did not have any defense developed on E.C.'s behalf. E.C.'s father asked Ms. Rafferty to tell E.C., who was in detention, that E.C. should accept the Commonwealth's offer.

Ms. Rafferty recommended that E.C. accept the plea deal. She relayed to E.C. his father's directive to take the plea deal. E.C. testified that Ms. Rafferty told him that he should plead guilty to the two charges or he would be tried as an adult. She told him that the Commonwealth had evidence that he confessed to the rape and burglary and that it would be his word against the detective's word. She told him that the police had his DNA. E.C. was never told that he might have to register as a sex offender. E.C. testified that he was never told that he had the right to appeal the disposition of the juvenile court even if he pleaded guilty.

In fact, although E.C. gave the police a sample of his DNA when he was interviewed by Detective Lloyd, the police had no DNA evidence against him. Ms. Rafferty. denies that she ever told E.C. or his parents that the police had DNA evidence to use against him.

E.C. accepted the plea deal and pleaded guilty on August 22 to rape and breaking and entering. As a result, E.C. was adjudicated delinquent. The abduction charge was dropped.

E.C. testified that he never would have pleaded guilty if he had known that there was a tape recording of his interview with Detective Lloyd. He knew he had not confessed to rape and burglary to Detective Lloyd. Ms. Rafferty told him that it was going to be his word against the detective's. Had he known that there was a recording, he would not have pleaded guilty. E.C. testified: "I would have fought the charges, even if I had to spend time in adult jail. I would have had something on my behalf."

Similarly, E.C.'s father testified that he would not have recommended that E.C. take the plea offer if he had known that there was any evidence in E.C.'s favor. E.C.'s father had been led to believe that there was no evidence in favor of E.C. and that E.C. was bound for adult prison for twenty-five years unless E.C. accepted the Commonwealth's offer. E.C.'s father testified:

> [Ms. Rafferty] never told me that there was a taped interview in which [E.C.] said that the sex was consensual. If she told me that, I would have had a different opinion. It would no longer have been just Detective Lloyd testifying against my son. There would have been evidence presented [on E.C's behalf]. I would have told [E.C.] not to take the deal even if he had to sit in adult jail or even if he might be convicted.

Following E.C.'s adjudication hearing, a hearing was held on August 30, 2007, on the issue of whether E.C. would be required to register as a sex offender under Virginia Code § 9.1-902. Ms. Rafferty presented no evidence to address the statutory factors that guided the judge's discretion on whether to require registration.

On September 19, 2007, the disposition hearing was held in juvenile court. No witnesses were called to testify on E.C.'s behalf. E.C. was sentenced to an indeterminate commitment to DJJ. He was ordered to register as a sex offender for the rest of his life.

On November 19, 2007, a hearing was held in the juvenile court to review the status of E.C.'s commitment to DJJ. E.C.'s commitment to DJJ was continued.

E.C. did not appeal his adjudications of delinquency or his disposition to the circuit court.

On November 23, 2007, E.G. recanted her allegations of rape. E.G. told her mother that she had lied, that E.C. did not rape her, and that the sex between her and E.C. had been consensual.

E.G.'s mother consulted an attorney, Eric Stone, about what to do in response to E.G.'s recantation. Mr. Stone put E.G.'s mother in touch with Ms. Rafferty. Ms. Rafferty did not ask to interview E.G. about her recantation. She asked that E.G. write a letter to the judge explaining her recantation. Given her myriad limitations, E.G.'s letter was not immediately forthcoming.

On February 28, 2008, E.C. moved that the juvenile court's adjudication of guilt be set aside based on after-discovered evidence, to wit E.G.'s recantation. On March 19, 2008, the juvenile court denied the motion to set aside the verdict as being untimely.

On May 27, 2008, E.G. wrote a letter recanting her allegations. The letter (Petitioner's Ex. # 1) stated:

> Dear Judge,
> [E] didn't rely rape me in fact we did it befor. [E] was a friend of mine befor this even happend. Me and [E] where good friends, but now it just seems that I lied about [E] now I will never forgive myself. [E] didn't realy come in by himself, I let him in.
>
> *[E.G.]*

On July 11, 2008, the circuit court denied E.C.'s motion to set aside the finding of guilt.

On July 11, 2008, E.C. filed a petition for a writ of error coram nobis, which was denied by the juvenile court on July 23, 2008, and by the circuit court on September 19, 2008.

On February 25, 2009, E.C. was paroled from the DJJ after seventeen months in custody.

On August 18, 2009, the Petition for Writ of Habeas Corpus Subject to Amendment was filed in the circuit court. In his petition, E.C. alleged, among other things, that he was denied the effective assistance of counsel.

Six days later, on August 24, 2009, E.C. was released from parole supervision.

On December 18, 2010, the circuit court dismissed E.C.'s petition, ruling that it had no jurisdiction over the matter because E.C. was no longer in custody. That ruling was reversed by the Supreme Court of Virginia on March 2, 2012. *E.C. v. Virginia Dep't of Juvenile Justice*, 283 Va. 522, 722 S.E.2d 827 (2012). The Supreme Court held that:

> [T]he collateral consequences imposed on E.C. by the convictions he is challenging are sufficient to sustain a continued controversy. The relief from these consequences that E.C. seeks is a determination that the convictions which imposed them are invalid because of the ineffective assistance of counsel and that he is entitled to a new trial. If successful, the relief he seeks can be afforded by the court exercising its habeas corpus jurisdiction.

283 Va. at 536.

E.C.'s case was remanded to the Circuit Court of Stafford County. The judges of that court recused themselves from any further proceedings in the case. On August 29, 2012, the undersigned judge was designated to act as presiding judge.

A hearing was held on February 25, 2013, at which time E.C. was granted a plenary hearing on his petition. The plenary hearing took place on July 16 and 17, 2013.

In addition to the fact witnesses who testified at the hearing, attorney William B. Reichhardt testified as an expert witness on the subject of representing juveniles in Virginia's juvenile justice system. He opined, among other things, that Ms. Rafferty's representation of E.C. fell well below the performance expected of a reasonably competent Virginia attorney representing juveniles charged with felonies.

In Mr. Reichhardt's opinion, Ms. Rafferty failed to conduct an adequate investigation of the case. Most significantly, Ms. Rafferty failed to ask the prosecutor or Detective Lloyd if E.C.'s interview was tape recorded. It is a reasonable practice for defense counsel to ask if the defendant made any statements. If the defendant made any statement, it would be memorialized in some way. At a minimum, there would be a police report. Any statement was likely to be recorded. If Ms. Rafferty had listened to the tape recording of E.C.'s interview with Detective Lloyd, she would have learned that it was not a confession. The statement was exculpatory.

Mr. Reichhardt opined that Ms. Rafferty's representation was deficient in her failure to interview potential witnesses, particularly E.C.'s brother, who had exculpatory evidence. Mr. Reichhardt was critical of Ms. Rafferty's failure to review the court's file to see whom the Commonwealth had subpoenaed as a witness for the transfer hearing and her failure to attempt to interview those witnesses.

Mr. Reichhardt further faulted Ms. Rafferty's failure to obtain E.C.'s school records and E.G.'s school records, both of which could have been subpoenaed in the juvenile court. According to Mr. Reichhardt, it is standard practice for a defense attorney to look at the school records of both the defendant and the complaining witness, particularly when the complaining witness is alleged to have mental incapacities.

In Mr. Reichhardt's view, it was impossible for Ms. Rafferty competently to have advised E.C. whether to plead guilty because she did not know the facts of the case due to her inadequate investigation.

Mr. Reichhardt found that Ms. Rafferty's failure to advise E.C about collateral consequences of his guilty plea, such as the possibility of being required to register as a sex offender for life, fell below the standards of minimally competent representation.

Finally, Mr. Reichhardt was critical of Ms. Rafferty's performance at the disposition hearing. Whether E.C. would be committed to DJJ or remain in the community was discretionary with the juvenile judge, as was whether E.C. would have to register as a sex offender. The juvenile judge is to consider the following factors in deciding whether the juvenile must register as a sex offender:

> (i) the degree to which the delinquent act was committed with the use of force, threat, or intimidation, (ii) the age and maturity of the complaining witness, (iii) the age and maturity of the offender, (iv) the difference in the ages of the complaining witness and the offender, (v) the nature of the relationship between the complaining witness and the offender, (vi) the offender's prior criminal history, and (vii) any other aggravating or mitigating factors relevant to the case.

Va. Code § 9.1-902(G).

Ms. Rafferty put on no mitigating evidence of any kind.

In Mr. Reichhardt's opinion, Ms. Rafferty's failings in her representation of E.C. made a difference in the outcome. E.C. was not given competent advice on whether he should plead guilty. In Mr. Reichhardt's opinion, had E.C. not pleaded guilty and had his case gone to trial after reasonably competent preparation by his counsel, the Commonwealth would have had difficulty in proving its case.

*Standard of Review*

Before deciding whether to plead guilty, a defendant facing the loss of his or her liberty is entitled to the effective assistance of competent counsel. *McMann v. Richardson*, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970).

To determine whether counsel's representation was ineffective to the extent that the defendant was denied his constitutionally-protected right to counsel, the court must apply the two-pronged test enunciated by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First:

> a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 690. Secondly, "[c]onflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id*. at 693. To prove prejudice:

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id*. at 694.

The *Strickland* test applies to defendants who pleaded guilty. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*,

474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). The court in *Hill* elaborated:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Id.* at 59. See also *Lewis v. Warden*, 274 Va. 93, 645 S.E.2d 492 (2007).

### Findings of Fact and Conclusions of Law

Applying the foregoing standards to the evidence presented at the plenary hearing on the petition, the court finds that Ms. Rafferty's representation of E.C. fell below the wide range of professionally-competent assistance.

The court finds that Ms. Rafferty's representation of E.C. was not reasonably competent in that she did little or no independent investigation of the facts of the case prior to the transfer hearing and her advice to E.C. to plead guilty.

Ms. Rafferty failed to discover that E.C.'s interview with Detective Lloyd, conducted within one hour of the alleged rape, was tape recorded. Had Ms. Rafferty learned that the statement was tape recorded and then actually listened to the recorded statement, as any reasonably competent counsel would have done, Ms. Rafferty would have known that E.C.'s statement was largely exculpatory. At best, E.C. confessed to having had an ill-advised, consensual sexual encounter with a physically handicapped girl one year younger than him. He did not admit that the sex was against E.G.'s will, that he had forced himself on her, that she said "no" but he persisted, that he had entered her house without her permission, that he had pushed her down on the bed, or that they had engaged in anal intercourse (whether consensual or by force). He also did not admit to having any awareness of E.G.'s intellectual or cognitive limitations. In addition, had

Ms. Rafferty listened to the taped interview, she would have been alerted to the possibility that E.C. had his own cognitive limitations.

Ms. Rafferty testified that she asked Detective Lloyd whether E.C.'s statement was recorded, but never got an answer. Reasonably competent counsel would not have failed to obtain an answer to the question of whether the statement had been memorialized in some way.

Assuming that Detective Lloyd told Ms. Rafferty that E.C. had "confessed" to him, reasonably competent counsel would have not relied on that representation without an independent investigation of the facts surrounding the defendant's statement and the actual substance of the defendant's statement.

The court does not believe Ms. Rafferty's testimony that E.C. made a "full confession" to her. In Ms. Rafferty's telling, E.C. confessed to a prolonged sexual assault, including forced fellatio, vaginal intercourse, anal intercourse, and more fellatio. Those statements did not "dovetail almost exactly" with what E.C. told Detective Lloyd in his taped interview. The court finds it difficult to believe that E.C. made a "full confession" to Ms. Rafferty and she did not make a single note of such a significant event in her representation of him.

Had she obtained E.C.'s school records, Ms. Rafferty would have learned that he had cognitive limitations. E.C.'s cognitive limitations would have been exculpatory on the issue of whether he recognized E.G.'s mental limitations prior to having sex with her. In addition, E.C.'s cognitive limitations would at a minimum be mitigating evidence on the issues of the disposition he would receive if convicted and whether he would be required to register as a sex offender.

Had Ms. Rafferty obtained E.G.'s school records, she would have learned, among other things, that E.G. had a poor reputation for truthfulness.

Ms. Rafferty testified that it was always the Commonwealth's theory of the case that E.C. took advantage of E.G.'s inability to consent to sex because of her mental limitations. The court finds that reasonably competent counsel would have investigated the complaining witness's ability to consent to sex. Had Ms. Rafferty made inquiry, she would have learned that E.G. was knowledgeable about sex and possessed the "mental capacity to have a basic understanding of the elementary and rudimentary nature and consequences of sexual intercourse" such that she could consent to sex. See, e.g., *Adkins v. Commonwealth*, 20 Va. App. 332, 457 S.E.2d 382 (1995).

The court finds that Ms. Rafferty's representation of E.C. was not reasonably competent in that she failed to inquire if the investigating officers had interviewed E.G. Had she asked, Ms. Rafferty would have learned that Detective Lloyd interviewed E.G. and that the interview was recorded. Had Ms. Rafferty listened to the tape recorded interview of E.G., as any reasonably competent counsel would have done, she would have

learned that E.G. was knowledgeable about sexual matters. She would have learned also that E.G.'s statement to Detective Lloyd was at times internally inconsistent, and was inconsistent with her statements to the SANE on the date of the alleged rape.

Prior to advising E.C. to plead guilty, Ms. Rafferty failed to ascertain the legal standard for the capacity to consent to sex. Instead, Ms. Rafferty assumed that, if E.G. was "slow" or "mentally retarded," she could not have consented to sex.

The court finds that Ms. Rafferty's representation of E.C. was not reasonably competent in that she did nothing to investigate mitigating evidence and ignored the mitigating evidence that E.C.'s parents developed for her. Ms. Rafferty had been told that E.C.'s brother could refute the charge of breaking and entering in that he saw E.G. invite E.C. into her house. Ms. Rafferty did not interview E.C.'s brother to evaluate whether he should be called as a witness.

Summarizing, the court finds that Ms. Rafferty's representation of E.C. met the first prong of the Strickland test when she failed: (1) to ascertain the existence of, obtain, and listen to E.C.'s taped interview with Detective Lloyd; (2) to ascertain the existence of, obtain, and listen to E.G.'s taped interview with Detective Lloyd; (3) to investigate E.G.'s reputation for truthfulness; (4) to investigate E.G.'s ability to consent to sexual activity; (5) to investigate E.C.'s cognitive limitations; and (6) to investigate and present to the court other exculpatory and mitigating evidence.

Further, the court finds that E.C. has proven the second prong of the *Strickland* test; specifically, that he was prejudiced as a result of counsel's ineffective representation. Had Ms. Rafferty conducted a reasonably competent investigation of the facts of E.C.'s case, E.C. would at a minimum have known that his statement to Detective Lloyd was recorded and that there was some evidence in support of his claims of innocence. It was not his word against the detective's, as he was told by counsel. Armed with that information, E.C. would not have pleaded guilty. E.C. need not prove that he would have been acquitted had he pleaded not guilty and gone to trial. Instead, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra*, 466 U.S. at 694. In this case, E.C. has shown sufficient evidence to undermine the court's confidence in the outcome of his guilty plea, adjudication, and disposition.

## Conclusion

For the foregoing reasons, the court finds that E.C. was denied the effective representation of counsel and that he was prejudiced by that ineffective representation within the meaning of *Strickland v. Washington, supra*. The court has today entered an order granting E.C.'s petition for a writ of habeas corpus.

*Final Order*

This matter came on for a plenary hearing on the petitioner's Petition for a Writ of Habeas Corpus on July 16-17, 2013, and, for the reasons stated in the court's opinion letter dated February 10, 2014, a copy of which is attached hereto and incorporated herein, it is hereby ordered that the Petition for a Writ of Habeas Corpus is granted; and it is further ordered that:

1. E.C.'s adjudications of delinquency entered by the Juvenile and Domestic Relations District Court of Stafford County in 2007 are hereby vacated;

2. The order of the Juvenile and Domestic Relations District Court of Stafford County requiring E.C. to register as a sex offender is hereby vacated;

3. The Virginia State Police shall forthwith remove E.C.'s name from the Sex Offender and Crimes Against Minors Registry;

4. E.C. is granted a new trial should the Commonwealth be so advised;

5. The Commonwealth's Attorney of Stafford County is directed to elect in writing whether to retry E.C., with such election to be made within sixty days of the entry of this order.